IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEWEAVER,<br><br>    Petitioner,<br><br>v.<br><br>RUNNELS ET AL,<br><br>    Respondents. | No. C03-00839 MJJ<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, MOTION FOR EVIDENTIARY HEARING, MOTION FOR LEAVE TO CONDUCT DISCOVERY** |

## INTRODUCTION

Before the Court is Emile DeWeaver's ("Petitioner") petition for a writ of habeas corpus. Petitioner also moves for leave to conduct discovery under Habeas Corpus Local Rule 2254-6 and requests an evidentiary hearing under Habeas Corpus Local Rule 2254-8. For the following reasons, Petitioner's writ of habeas corpus is **DENIED**, his Motion For Leave To Conduct Discovery is **DENIED**, and his Request for An Evidentiary Hearing is **DENIED**.

## FACTUAL BACKGROUND

On February 15, 2000, Petitioner was convicted of first degree murder and attempted first degree murder in violation of California Penal Code § 187. (Petition ¶ 1.) Petitioner was sentenced to 67 years to life in prison. (Answer at 2:6-9.) On November 28, 2001, the California Court of Appeal denied Petitioner's timely appeal. *Id.* Subsequently, Petitioner filed a petition for review with the California Supreme Court which was denied. On February 26, 2003, Petitioner filed the instant writ of habeas corpus. Petitioner alleges that his constitutional rights were violated during

1  his pretrial interrogation and again during the jury deliberation phase of his trial.

2         **A.**     **Petitioner's Arrest & Interrogation**

3        On March 22, 1998, Petitioner and his companions were arrested for carrying two loaded

4  firearms in their vehicle.  *Id.*  Following his arrest, Petitioner was read his Miranda rights.  *Id.*

5  Petitioner told Sergeant Clement that he did not wish to give a statement.  *Id.*  Sergeant Clement

6  ended questioning.  *Id.*

7        Police later obtained information that the firearms had been involved in the shooting and

8  death of Robert Evans ("Evans") and shooting of Valerie Jordan ("Jordan").  *Id.* ¶ 10.  Two days

9  after Petitioner's arrest, two different detectives, Sergeant Joyner ("Joyner") and Sergeant Loman

10 ("Loman"), questioned Petitioner about the shootings.  *Id.*

11       According to Joyner, the detectives read Petitioner his Miranda rights before questioning.  *Id.*

12 At 11:34 a.m., Petitioner allegedly waived those rights verbally, by initialing a waiver form, and by

13 writing "11:34" on the form.  (Answer at 9:24.)   According to Joyner, Petitioner asked to be

14 returned to his cell at the beginning of the interrogation.  (Answer at 10:12-13.)  Joyner told

15 Petitioner that it was his job to obtain the truth and that there were two sides to every story.  *Id.* at

16 10:15-17.  Joyner told Petitioner that if he went back to his pod, "the situation wasn't going to go

17 away, so now is the time to take care of it."  *Id.* at 10:17-19.  Joyner testified that Petitioner then

18 asked to see the photo lineup in which he had been identified.  *Id.* at 10:21-24.  Joyner showed

19 Petitioner the lineup.  Before going on tape, Joyner believed that Petitioner did ask if he could make

20 a phone call to call his wife or girlfriend.  *Id.* at 11:6-9.  According to Joyner, he then told Petitioner

21 that once they finished conducting their business Petitioner could make a call.  *Id.*  After taping

22 Petitioner's statement, Joyner allowed Petitioner to make the phone call.  *Id.*

23       Petitioner testified to a different version of these events.  According to Petitioner, he was left

24 in the interrogation room for 1-2 hours before Sergeant Joyner and Loman arrived.  (Petition ¶ 19.)

25 He immediately said that he did not wish to speak to the officers.  *Id.*  The officers asked him why.

26 *Id.*  Petitioner explained that he did not wish to speak to homicide detectives, and then asked to be

27 taken back to his cell.  *Id.*  According to Petitioner, the detectives then replied that Petitioner should

28 hear them out and if he still wanted to go back to his cell, they would take him back.  *Id.*  In response

*United States District Court — For the Northern District of California* (left margin)

1  to Petitioner stating that he did not want to speak with them because he was frightened, the
2  detectives allegedly said "you're supposed to be scared because you're not the killer, you're in over
3  your head, we're here to help you." *Id.* Petitioner further alleges that he requested to go back to his
4  cell several times, and that at one point he told the officers "the only person I want to talk to is my
5  lawyer." *Id.* at 19-20. In addition, Petitioner asked to make a phone call to a family member to help
6  make a decision. *Id.* at 21. According to Petitioner, the officers said that the petitioner would have
7  to make a statement first. *Id.*

8        Petitioner alleges that the detectives then intimated that the victim was a bad person and
9  hypothesized that maybe the victim was threatening Petitioner. *Id.* ¶ 22. The detectives allegedly
10 also suggested that there were two guns involved, that the .38 was the one that killed Evans and that
11 the person using the other gun was guilty only of an assault with a deadly weapon. *Id.* The
12 detectives then allegedly told Petitioner that the murder charge carried a life sentence, but that an
13 assault charge would require only a five to ten-year sentence. *Id.* Finally, the detectives allegedly
14 said that if Petitioner did not talk to them, he would look guilty, but if Petitioner did talk to them, he
15 might be shown leniency because of his remorse and honesty. *Id.*

16       The detectives only taped the last 20 minutes of the interrogation. *Id.* Before starting the
17 tape, Petitioner alleges that the Detectives told him that "this is your last chance." According to
18 Petitioner, Joyner intimated that there would potentially be repercussions if it became known on the
19 street that Petitioner had killed the victim. Petitioner alleges that Joyner suggested that he would
20 look out for his family and that the police could protect them from any threat. *Id.*

21       At the end of the interrogation, Petitioner made a taped statement to the police. (Answer at
22 6:19.) The tape was then later played for the jury at trial. *Id.* at 6:20.

23     **B.**    **Trial[1]**

24       On February 3, 2000, the jury at Petitioner's trial was given final instructions and sent to
25 deliberations. (Petition ¶ 43.) On February 9, 2000, the jury asked the court to define "conscious
26 disregard for human life." *Id.* at ¶ 44. The jury also asked what would happen if they were at an
27 impasse. *Id.* Later that day, the foreman sent a note stating that "one juror's conduct is hindering
28

---

[1] The following facts are based on findings of fact by the California Court of Appeal.

3

the progress of this panel to make progress." *Id.* The court and counsel conferred with the foreman in response to the note, which said that juror number 8 ("Juror 8", "Juror no. 8") was being belligerent and uncooperative. *Id.* In response, the court reread the jury instructions and stated:

> "Each of you must decide the case for yourself but should only do so after discussing the evidence and the instructions with the other jurors. Do not hesitate to change an opinion if you are convinced you are wrong. However, do not decide any question in a particular way because a majority of the jurors or any of them favor that decision . . . . Should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation." *Id.*

On February 10, 2002, the foreman requested an "urgent conference." (Petition ¶ 45-51). The foreman indicated in his note that "some jurors are ready to walk if progress does not occur regardless of the consequences." *Id.* The foreman told the court that Juror no. 8 was interpreting the law differently than the other jurors. *Id.* The judge asked if Juror no. 8 was "refusing to follow the law." *Id.* The foreman responded no. Then the judge asked if Juror no. 8 was "interpreting the instructions in a manner that is inconsistent with the plain meaning of the language." *Id.* The foreman said that he was not sure, but that the juror did not share the interpretation of the other jurors. *Id.* The judge asked if the juror had taken a particular position from the start and then had not budged. The foreman responded that Juror no. 8 "didn't seem to be responsive to what's being shared." *Id.* The judge asked if the juror appeared to be basing his opinion on "some higher authority or religious beliefs or personal philosophy that disagrees or that is contrary to the instructions . . . ." The foreman replied "no." *Id.* The court asked if Juror no. 8's position was the one that prevented the jury from reaching any conclusions at all. The foreman said "yes". *Id.* Finally, the court asked "Does Juror no. 8 appear to have an agenda?" *Id.* Foreman responded, "no, he's just got his views." *Id.* Later that day the jury was excused for the weekend.

On February 14, 2000, the judge substituted an alternate juror for Juror no. 2, who had been in a car accident over the weekend. *Id.* Because the alternate juror had not participated in the deliberations, the judge instructed the jury to begin deliberations again from the beginning. *Id.* The trial court also discussed the foreman's warning that "some jurors are ready to walk," suggested that this was not appropriate, and told the jury that it was important that everybody deliberate with an open mind. *Id.* Finally, the court instructed the jury to recommence deliberations and to inform the

4

court whether, in light of the renewed deliberations, they wanted further definition of any terms. *Id.*

The trial judge then "dismissed the jury but had Juror 8 remain to discuss a note he had written to the court." (Court of Appeal Opinion, pg. 12.) The court obtained a list of issues that Juror no. 8 believed were contrary to the court's instructions. (Petition ¶ 45-51.) Juror no. 8 was concerned that the jurors were considering punishment and also evidence not presented in open court regarding the crime scene. *Id.* After separately examining Juror no. 8 and the foreperson, the court found no juror misconduct.

On February 15, 2000, the judge reread the various instructions to the jury concerning reasonable doubt, criminal intent, and circumstantial evidence. (Petition ¶ 52-59.) The court gave an expanded version of a hypothetical given earlier in the proceedings to explain the concepts of "circumstantial evidence" and "criminal intent." In this illustrative hypothetical, the trial judge offered an example of his young niece repeatedly insisting on having some chocolate right away, but being told by her mother that she would have to wait until after dinner. *Id.* When the mother subsequently went into the kitchen to check on dinner, she discovered a chair had been pulled from the kitchen table to the counter and that there was an irregular hole in the cake. *Id.* In the expanded version, a second child, younger than the niece, was added as an accomplice, and possible defenses the child might raise were discussed. *Id.*

In the original version, the trial judge contrasted circumstantial evidence, such as chocolate frosting on the child's mouth and crumbs on the child's clothing, with direct evidence, which would have involved direct observation on the part of the mother. In the expanded version, the judge noted that the circumstantial evidence showed that the child had not been overcome with hunger and spontaneously grabbed the piece out of the cake. Instead, the judge explained, the child had pushed a chair next to the table so that she could reach the cake. The court then compared this to the premeditation element of murder, concluding that the child premeditated and deliberated, since the act of pushing a chair next to a table and climbing up on it required both mental states. *Id.*

The court then instructed the jury to:

"keep in mind that these instructions that I have read to you and that I've talked about here have to still be considered, and I went to them because they seem to be responsive to the questions that you asked, but they still have to be read in light of all the other instructions. No one instruction is entitled to any greater weight than the others. Please do not construe

5

> my explanation to be a comment by me on the evidence or a suggestion on what you should find to be the facts. Please remember that you are the exclusive judges of the facts and that you may disregard any or all of my comments if they do not coincide with your views of the evidence."

(Court of Appeal Opinion, pg. 14.)

The jury returned its verdict of guilty later that afternoon.

## LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000). Habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 121 S. Ct. 1910, 1920 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

**A.      Right to Remain Silent**

**1.      *Michigan v. Mosley***

Once a suspect has invoked his right to remain silent, law enforcement authorities must "scrupulously honor" the suspect's decision to cut off earlier questioning. *Michigan v. Mosley*, 423 U.S. 96, 102-103 (1975). Petitioner contends that the invocation of his right to remain silent during his first interview was not scrupulously honored because he was questioned again about essentially the same crime. Petitioner argues that both interrogations were tied together by the same evidence, namely, the two guns. Respondents assert that no Miranda violation occurred because significant

6

1 time passed between the first and second interrogation, and because prior to the second
2 interrogation, Petitioner was freshly admonished.

3    In *Mosley*, the court found that the defendant's second interrogation was proper and stressed
4 that after the defendant had invoked his right to remain silent, the police "immediately ceased the
5 interrogation, resumed questioning only after the passage of a significant and provision of a fresh set
6 of warnings, and restricted the second interrogation to a crime that had not been a subject of the
7 earlier interrogation." *Id.* at 106.

8    The trial court found that the Petitioner's initial invocation of his Miranda right to silence
9 was honored. (RT 222-23, 225.) The court noted that once Petitioner initially invoked his right to
10 silence, all questioning ceased for two days. (RT 222-223.) Moreover, the court noted that a
11 completely different set of detectives approached Petitioner during the second interrogation. *Id.*
12 The trial court also found that Petitioner's second interrogation was for a different crime, that the
13 first interrogation during his initial arrest was for a separate offense. *Id.* Further the court found that
14 Petitioner was reread his Miranda rights immediately preceding the second interrogation. (RT 223.)
15 Thus, the trial court concluded that the second interrogation did not violate Miranda under the
16 standard set out by *Mosley*.

17    The Court finds that the trial court's application of the law was objectively reasonable. The
18 *Mosley* court found the second interrogation permissible based on the following factors: the second
19 interrogation took place several hours after the first; the officers provided a fresh set of Miranda
20 warnings preceding the second interrogation; and the officers restricted the second interrogation to a
21 crime that had not been a subject of the earlier interrogation.[2] In this case, the second interrogation
22 took place two days after the first; the officers provided a fresh set of Miranda warnings, and the
23 officers restricted the second interrogation to a different crime than the first interrogation. The
24 initial interrogation involved the drug and gun possession charges, while the second investigation

---

[2] The trial court found that the Petitioner was questioned about an unrelated crime during his second interrogation. This finding is not unreasonable. Petitioner's arrest and initial interrogation was on March 22 for unlawfully possessing firearms. Detectives at that time had no knowledge of the firearm's connection to the murder. The fact that the two crimes related to the same evidence is not enough to deem the two crimes the same crime. *See Texas v. Cobb*, 121 S.Ct. 1335, 1340-1342 (2001) (holding that test of whether there are two offenses or only one is whether each crime requires proof of a fact the other does not.)

7

was focused on the homicide. Morever, different detectives administered the second interrogation. Thus, it was a reasonable application of *Mosley* to find that no Miranda violation occurred.

### 2.     Petitioner's Request to Return to His Jail Cell

Petitioner argues that he invoked his Fifth Amendment right to silence when he asked to be returned to his jail pod. Respondents assert that Petitioner's request was largely ambiguous, simply expressing his aversion to facing reality rather than invoking his right to silence.

The Supreme Court has not ruled on what amounts to an invocation of the right to remain silent. Many lower courts have held that a suspect's request to be taken to jail, or even to go home, did not evidence a refusal to talk further, and that continued questioning thereafter did not violate Miranda. *See Mueller v. Angelone*, 181 F.3d 557, 576 (4th Cir. 1999); *U.S. Clark*, 67 F.3d 1154, 1163 (5th Cir. 1995); *Delap v. Dugger*, 890 F.2d 285, 290-293 (11th Cir. 1989).

The trial court found Petitioner's testimony that he continuously asked to return to his cell was not credible. (RT 224.) Morever, the court interpreted Petitioner's request to return to his jail cell as a "mere momentary lapse or a situation where [Petitioner] was trying to avoid reality," not an invocation of the right to silence. *Id.*

The Court finds that the trial's court interpretation of the facts was reasonable. Even if Petitioner's claim that he repeatedly requested to go back to his cell, a claim which is disputed by Joyner and was found lacking in credibility by the trial court, is taken at face value, the request is still ambiguous, and not a clear invocation of his Miranda rights. Petitioner signed the waiver only a few minutes after the interrogation began. (RT 225.) During those few minutes, the interrogating officers stated their full case against him to that point. *Id.* In those same few minutes, Petitioner first asked to go back to his cell and then signed the waiver. Further, Petitioner had been interviewed by police officers in the past, in some instances choosing to talk while in others clearly invoking his right to silence. (RT 231.) Petitioner knew how to clearly invoke his Miranda rights, but instead only asked to go back to his cell. Having been suddenly made aware of the case against him, Petitioner's request could, therefore, reasonably be interpreted as an expression of aversion to facing reality rather than an invocation of his right to silence. *See People v. Rich*, 45 Cal. 3d 1036,

8

1077-78 (1989) (holding that in the polygraph setting, the defendant's statement that he was going to leave was not an invocation of Miranda where officers did not prevent the defendant from leaving, the defendant stayed at officer's request, and the defendant later stood up and actually left).

**B.     Voluntariness of Miranda Waiver**

Petitioner argues that his guilty confession was involuntary and in violation of his Fifth Amendment rights due to coercive psychological pressure applied by the interrogating officers. A confession is voluntary if it is the product of a rational intellect and a free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). A confession is involuntary when the defendant's will was overborne. *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). In determining whether the defendant's will was overborne, a court should assess the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).

In support of his argument, Petitioner asserts that Joyner conditioned his ability to place a telephone call upon his first giving a statement. Additionally, Petitioner notes that after he told Joyner that he wanted to be taken back to his cell, Joyner told Petitioner that his problem would not go away unless Petitioner took care of it. Also, Joyner allegedly told Petitioner that it would be in Petitioner's best interests to cooperate and that it was important to get Petitioner's side of the story. (Memorandum in Support of Petition at 6:24-7:4.)

Additionally, Petitioner testified that Joyner suggested he would only be guilty of the lesser offense of assault with a deadly weapon if he used the 9mm pistol and not the revolver, and that the murder charge carried a life sentence but assault carried only a five to ten-year sentence. Petitioner also testified that Joyner suggested the victim was a "gangster type" who may have been threatening them. Joyner further said, according to Petitioner's testimony, that if Petitioner did not talk to him he would look guilty, but if Petitioner talked to him, he might be shown leniency because of his remorse and honesty. (Memorandum in Support of Petition at 7:4-7:16.)

Respondents assert that at trial, Joyner denied Petitioner's allegations. Joyner testified that he did not use any promises, threats, force, fear or violence to obtain Petitioner's statement. Joyner denied having discussed Petitioner's potential sentence "or anything of that nature," and he denied telling Petitioner that he could use the phone only if he first gave a statement. Joyner alleges telling

9

1  Petitioner that he could make his call once they were finished conducting their business, not once he
2  had provided a statement. (Answer at 10:25-11:9.)

3  After reviewing the record, the trial court found Joyner's testimony credible and rejected
4  Petitioner's testimony. (RT 230.) The court found that the tape recorded statement clearly showed
5  Petitioner's ability to make decisions, and that his will was not overborne. *Id.* The trial court made
6  an express finding of credibility concerning Petitioner's testimony. This finding is presumed correct
7  on habeas review unless Petitioner provides clear and convincing evidence to rebut that
8  presumption. 28 U.S.C. § 2254(e)(1). Petitioner has failed to meet this burden. Petitioner's
9  reliance, in support of his coercion claim, upon the fact that after he asked to be taken back to his jail
10 pod that Joyner replied that this would not make the situation "go away", and the assertion that his
11 ability to make a telephone call was conditioned on a confession, fares no better on this record.
12 Petitioner's request to be taken back to his jail pod and the alleged inability to make an immediate
13 phone call, without more, establishes neither an invocation of his right to remain silent nor coercion.
14 In light of Petitioner's discredited testimony, the trial court's decision that Petitioner's confession
15 was voluntary is not objectively unreasonable.

## C. Trial

### 1. *Allen* Charge

Petitioner argues that the trial judge coerced the jury into returning a verdict of first degree murder by way of his instruction to continue deliberations. The use of a supplemental jury charge given by the court to encourage a jury to reach a verdict after the jury has been unable to agree for some period of deliberation has long been sanctioned. *Allen v. United States*, 164 U.S. 492, 501-02 (1896). Such a supplemental instruction or *Allen* charge, as it is commonly referred to, has been criticized as potentially coercing jurors to return a guilty verdict. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965) (jurors may not be coerced into surrendering views conscientiously held; remanding for new trial where judge's statement to jury that "you have got to reach a decision in this case" was found to have coercive effect).

A federal district court's decision to give an *Allen* charge must be upheld "unless it is clear from the record that the charge had an impermissibly coercive effect on the jury." *United States v.*

*Easter*, 66 F. 3d 1018, 1023 (9th Cir.) (citation omitted). The standard is not much different on federal habeas review of a state criminal conviction. *See Jiminez v. Myers*, 40 F.3d 976, 979 (9th Cir. 1993). Federal courts reviewing an *Allen* charge given by a state court must consider the supplemental instruction in its context and under all circumstances. *Id*. at 980. Whether the comments and conduct of the state trial judge violated due process ultimately turns on whether "the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision." *Id*. at 979 (quoting *Locks v. Summer*, 703 F.2d 403, 406 (9th Cir. 1983).

Because an *Allen* charge carries the potential for jury coercion, the trial judge using the charge should instruct jurors not to surrender their sincere convictions when they reassess their positions. *See United States v. Bonam*, 772 F.2d 1449, 1451 (9th Cir. 1985); *cf. Rodriguez*, 125 F.3d at 750 (no coercion where judge not only advised jurors not to surrender their sincerely held beliefs but 1) made no comment on numerical split, 2) did not know whether the majority favored conviction or acquittal, and 3) did not know the identity of the holdouts; fact that the jury deliberated for four more days and called for a reading of testimony indicated that there had been no coercion). This assures that the "integrity of individual conscience in the jury deliberation process . . . not be compromised." *United States v. Mason*, 658 F.2d 1263, 1268 (9th Cir. 1981). An *Allen* charge without more, however, always stands at the brink of impermissible coercion. *See United States v. Seawell*, 550 F.2d 1159, 1163 (9th Cir. 1977). If the *Allen* charge violated petitioner's right to due process, habeas relief is appropriate if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Weaver*, 197 F.3d at 364 (quoting Brecht v. Abrahamson, 507 U.S. 617, 637 (1993)).

Petitioner argues that the totality of the circumstances establish a coercive *Allen* instruction. Petitioner analogizes to *Jiminez v. Meyers*, 40 F.3d 976 (9th Cir. 1994). In *Jiminez*, the court held that under the totality of circumstances, a coercive *Allen* charge had occurred when:

> (1) the judge inquired how many ballots had been taken, and was told "five or six"; (2) the judge asked how the vote started and ended; the foreperson responded that the jury started out seven to five, went to eight to four, then nine to three, and was currently nine-two and one; (3) the judge then asked "has there been any movement one way or another?" The foreman stated "yes there has been some movement in one direction"; (4) the court then said "Well that's what's important to me....I want to find out that there has been movement" (5)

11

> The judge returned the jury to its deliberations. After further deliberations, the jury informed the court it was at an impasse a second time, and (6) on inquiry stated it was divided eleven to one. Again, the trial court took steps beyond those taken in Locks: (7) the court said: "So there has been, then substantial movement since the last time, " and the foreperson responded "yes"; (8) the court then stated: "Due to fact we have that type of movement, I would request, then, to finish the rest of today and see where we are at that point in time."

*(Id.* at 980.)

The *Jiminez* court had given a defacto *Allen* charge by "eliciting the progression in the voting, determining it was moving in one direction, expressing his approval of that progression, and telling the jury to continue its deliberation . . . ." *Id.* The court also concluded that after the trial court had knowledge that there was only one hold-out juror, the trial court furthered its coercion of a unanimous verdict by instructing the jury to continue deliberating until the end of the day. The court felt that this instruction "sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict, and the hold-out juror was to cooperate in the movement toward unanimity." *Id.* at 981. Petitioner argues that the facts supporting a coercive jury charge is even more egregious in this case than *Jiminez*.

Petitioner argues that the Court's first *Allen* instruction, which occurred on February 9, 2000 was coercive. In response to the complaints of the foreman that Juror no. 8 was being belligerent and uncooperative, the court stated:

> "Each of you must decide the case for yourself but should only do so after discussing the evidence and the instructions with the other jurors. Do not hesitate to change an opinion if you are convinced you are wrong. However, do not decide any question in a particular way because a majority of the jurors or any of them favor that decision . . . . Should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."

(Court of Appeal Opinion, pg. 14.)

Specifically, Petitioner contends that the court failed to give a cautionary instruction advising jurors that they need not give up their conscientiously held views. Instead, the court merely stated that a juror should "not decide any question in a particular way because a majority" favored that decision. (RT pg. 925.) Petitioner also argues that the instruction was particularly coercive since the court had basically been advised that the jury was deadlocked at an 11-1 split. Further, Petitioner notes that the foreman had specifically identified the holdout juror to the court. Finally, the court instructed the jurors to continue to deliberate, and to report any refusal to do so to the

12

1 judge. Based on the abovementioned factors, Petitioner alleges that the first *Allen* instruction was
2 coercive.

3 Petitioner also argues that the second *Allen* instruction, which occurred on February 14,
4 2000, was improper. In response to continuing complaints from the foreman concerning Juror no. 8
5 and the foreman's note indicating that "some jurors are ready to walk if progress does not occur
6 regardless of the consequences," the trial court stated aloud to the jury the contents of the foreman's
7 note, suggested that this was not appropriate, and told the jury that it was important that everybody
8 deliberate with an open mind. Then the trial court instructed the jury to recommence deliberations
9 due to the replacement of Juror no. 2. Finally, the trial judge excused all jurors except Juror no. 8.
10 (Petition ¶ 45-51.)

11 Petitioner contends that the court's actions suggested to the jury that it was inappropriate to
12 declare a deadlock. Petitioner asserts that since the court already knew that the split had been 11-1
13 and that Juror no. 8 was the holdout, the court's instruction to deliberate again due to the
14 replacement for Juror no. 2 would instead seem particularly directed towards Juror no.8.
15 Furthermore, Petitioner argues that the coercive effect of the second *Allen* instruction was
16 heightened because the judge failed to remind jurors of their obligation not to surrender
17 "conscientiously held beliefs." Finally, Petitioner notes that the coercive effect was heightened
18 because, immediately after instructing the jury, the judge adjourned them all except for Juror no. 8.

19 Contrary to Petitioner's assertions, the Court of Appeal found that the trial court's actions did
20 not amount to a coercive *Allen* charge. The court set forth the abovementioned facts and stated:

> "Equally inapt is defendant's suggestion that the court's responses to the various notes from the jury show it "intended the jury to reach a verdict at all costs" or amounted to a de facto, coercive *Allen* charge. To the contrary, the record of the court's inquiries into the questions and problems reported by the juror reveals a prudent, reasonable and balanced course of action. We search the record in vain for any indication of coercion, express, or implicit, in the court's questioning those jurors or in its discussion of the foreperson's concerns with the entire jury."

25 (Court of Appeal Opinion, pg. 15  n.7.)

26 After a review of the record, the Court finds that the Court of Appeal decision was not

13

objectively unreasonable.[3] This case is distinguishable from the factors present in *Jiminez.* The trial court did not inquire as to the number of ballots taken by the jury or whether "movement was occurring." Instead, the trial judge specifically stated on February 9, 2000 that he did not "want to know anything about that." (RT pg. 910.) Further, the trial court expressed no implicit or explicit approval of movement, nor was there any implication that the trial court desired the majority to convince Juror no. 8 to change his vote. The trial court's February 14, 2000 instruction to deliberate again was spurred by the required replacement of Juror no. 2 and was not an attempt to coerce a unanimous verdict.

In fact, the court continually reminded the jurors of their obligation not to surrender to the majority. On February 9, 2000, after complaints from the foreperson that Juror no. 8 was being belligerent, insulting, and uncooperative, the trial court reminded jurors to not decide in any particular way simply because a majority of the jurors favored that decision. On February 14, 2000, after repeating the jury instructions, the trial court again told the jury it was important that everyone deliberate with an open mind.

Although the trial court did hold back Juror no. 8 while dismissing the rest of the jury to deliberate, it did so only in response to a note from Juror no. 8. The jury could have also inferred that the trial court was merely investigating the allegations from the foreman that Juror no. 8 was "belligerent and uncooperative." The inference that the decision to hold back Juror no. 8 was directed at obtaining a unanimous verdict is further countered by the trial court's express instruction right before dismissing the jury noting the importance of each juror's personal, open-minded

---

[3] Furthermore, the Court finds that the Court of Appeal's decision was not contrary to clearly established federal law. Petitioner's relies upon *Packer v. Hill*, 277 F.3d 1092 (9th Cir. 2001), where the Ninth Circuit held that a state appellate decision was contrary to clearly established United States Supreme Court on the question of jury coercion because the state appellate court failed to cite any federal law and failed to apply the totality of circumstances test as required by Supreme Court precedent when it considered only three particular incidents in its analysis. Petitioner notes that in this case, the Court of Appeal discussion of jury coerciveness was even more cursory than in *Packer,* and cited no federal authority. However, Petitioner's reliance on *Packer* is misplaced because it is no longer appropriate legal authority. The Ninth Circuit decision in *Packer* was overruled and reversed by the Supreme Court in *Early v. Packer*, 537 U.S. 3 (2002). The Supreme Court reasoned that state courts need not cite nor even be aware of Supreme Court authority "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* at 8. In addition, the Court found that the defendant's contentions that the appeals court failed to consider many facts and circumstances was contradicted by the appellate court's opinion which set forth many facts and circumstances concerning the court's conduct with the jury. Here, the Court of Appeal set forth the pertinent fact in its opinion and concluded that the facts did not amount to improper jury coercion. Moreover, the court's reasoning and decision is not contrary to clearly established United States Supreme Court precedent.

14

deliberation. It is clear from the record that the trial court was simply responding to issues raised by the jurors rather than asserting independent coercive pressure for an unanimous verdict.

The actions of the trial court in this case are in contrast to the inappropriate conduct of the *Jiminez* court, where the trial judge expressed approval of the jurors' progress in the deliberations and told the jury to make every effort to reach a unanimous verdict. *Jiminez*, 40 F.3d at 980. Under the totality of circumstances, the Court of Appeal's finding that there was no jury coercion is objectively reasonable.

### 2.     **Illustrative Hypothetical**

Petitioner next contends that the trial court's expanded chocolate cake hypothetical coerced a jury verdict. The trial court's instructions, Petitioner argues, suggested to the jury that Petitioner's defenses were akin to the excuses of a three-year-old child, and that Petitioner's guilt was so obvious as to require no further discussion. Moreover, Petitioner notes that the timing of this instruction was particularly coercive since it was given after the jury foreman had reported a probable deadlock twice, that the split was 11-1, and that Juror no. 8 was the hold-out juror.

Petitioner also argues that the trial court's chocolate cake example misdefined the elements of first and second degree murder. First, Petitioner points to the fact that the trial court defined "deliberate" as meaning the state of mind of a three-year-old child who decided "I want cake and I want it now." (Petition ¶ 52-59.) Petitioner argues that this is error because the court reduced the state of mind for "deliberate" for an adult, lowering the required "careful thought and weighing of considerations for and against a proposed course of action" to simple problem solving that a three-year-old could accomplish. Similarly, Petitioner argues that the court misdefined "premeditated" when using as illustration a three-year-old child who decided to push a chair next to a table to steal a piece of cake. *Id.* Petitioner argues that the judge's chocolate cake instruction makes it reasonably likely that one or more jurors could have concluded that the appropriate standard for "premeditated" and "deliberate" were the mental processes of a three-year-old child.

Respondents contend that the use of a child as part of the hypothetical could not possibly have been construed by the jury as reflecting that Petitioner, an adult, would readily have formed the required criminal intents, in like manner to the child. Respondents assert that the hypothetical

15

1  involved a child solely because she fit naturally into the illustrative cake-stealing circumstances.

2  In reviewing an ambiguous instruction, the court must inquire whether there is a "reasonable
3  likelihood" that the jury has applied the challenged instruction in a way that violates the
4  Constitution. *See Boyde v. California*, 494 U.S. 370, 380 (1990). A determination of a reasonable
5  likelihood that the jury has applied the challenged instruction in a way that violates the Constitution
6  establishes only that an error has occurred. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998). If
7  an error is found, courts also must then determine that the error had a substantial and injurious effect
8  or influence in determining the jury's verdict, *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993),
9  before granting relief in habeas proceedings. *See Calderon*, 525 U.S. at 146.

10  Here, the Court of Appeal found that the chocolate cake instructions were improper because
11  the instructions were improperly one-sided.[4] (Court of Appeal Opinion, pg. 14-17.) The Court of
12  Appeal reasoned that because the trial court provided the jury with a one-sided hypothetical that
13  supported the prosecution's case, the instruction was improper. However, the Court of Appeal also
14  determined that the error was harmless and did not deprive Petitioner of a fair trial. The Court of
15  Appeal reasoned that because the jury was also correctly instructed on the relevant law, and because
16  the trial court expressly admonished the jury not to use its chocolate cake illustration as a comment
17  on the evidence or a suggestion of a verdict, the error was not prejudicial. Moreover, the Court of
18  Appeal noted that the 'chocolate cake' hypothetical was so factually disparate from the case at hand
19  that its impact on the jury would have been minimal.

20  The Court finds that the Court of Appeal's analysis was objectively reasonable. The jury
21  was given correct instructions on the law and expressly advised not to use the chocolate cake
22  illustration as a comment on the evidence or as suggestion towards a verdict. As such, it was
23  reasonable for the Court of Appeal to conclude that the improper jury instruction did not result in an
24  error that had a substantial and injurious effect or influence in determining the jury's verdict.

25  The Court of Appeal also found that the trial court did not misdefine the elements of first and
26  second degree murder. The Court of Appeal reasoned that no reasonable juror could have inferred

27

28  [4]*See People v. Lyons*, 47 Cal. 2d 311, 323 (1956) (holding that an accurate statement of a proposition of law which is entirely inapplicable to the facts of a case may mislead a jury to the prejudice of a party).

16

1 from this example that the mental processes of a three-year-old would suffice to establish the
2 necessary criminal intent, particularly because a child as a matter of law cannot have the requisite
3 criminal intent for these offenses.  Further, the Court of Appeal noted that a reasonable juror would
4 not have drawn an improper inference in the context of the standard, proper instructions given to the
5 jury.

6 Based on these considerations, the Court finds that the Court of Appeal's decision was
7 objectively reasonable.  It is unlikely that a juror would have analogized the criminal intents for
8 deliberate and premeditated murder to the reasoning of a three-year-old child when it was so clear,
9 given the fanciful nature of the hypothetical, that it example was figurative and for illustrative
10 purposes, rather than for literal interpretation.  Morever, the trial court gave the jury the standard
11 instructions regarding criminal intent, and viewed within the full context, the jury did receive a
12 significant amount of proper instructions on the issues.

### D. Petitioner's Request For Leave To Conduct Discovery

A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course.  *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Rule 6(a) of the Federal Rules Governing Section 2254 Cases, provides that a "party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."  Before deciding whether a petitioner is entitled to discovery under Rule 6(a) the court must first identify the essential elements of the underlying claim.  *See Bracy*, 520 U.S. at 904 (difficulties of proof aside, petitioner's allegation of judicial bias, if proved, would violate due process clause).  The court must then determine whether the petitioner has shown "good cause" for appropriate discovery to prove his claim.  *See id.*

Good cause for discovery under Rule 6(a) is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ."  *Id.* at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)).  For example, in *Bracy*, the Supreme Court found the petitioner established good

17

cause for discovery where he provided specific allegations lending support to his claim that the trial judge was actually biased in his case. *See id.* at 909; *see also McDaniel v. United States District Court (Jones)*, 127 F.3d 886, 888 (9th Cir. 1997) (good cause for discovery found where petitioner's claims did not appear purely speculative or without any basis in record, each claim included factual allegations and statement of exhaustion, and materials sought through discovery were not available from petitioner's appellate counsel, who had destroyed entire file); *Jones v. Wood*, 114 F.3d 1002, 109-10 (9th Cir. 1997) (good cause found where petitioner identified specific material he needed to argue effectively that trial lawyer had rendered ineffective assistance, particularly where there was never any hearing on ineffective assistance claim at state court level). The scope and extent of the discovery permitted under Rule 6(a) is a matter confided to the discretion of the district court. *See Bracy*, 520 U.S. at 909.

Petitioner moves for leave to conduct discovery under Habeas Corpus Local Rule 2254 -6. Specifically, Petitioner requests the address and telephone number of Juror. no. 8 so that Petitioner can obtain his statement and, if necessary, subpoena him to testify at an evidentiary hearing.

The Court finds that Petitioner has failed to establish good cause for this discovery. Petitioner failed to state any specific facts showing that Juror no. 8 felt coerced by the trial court, and his arguments rely primarily on mere speculation. After trial, Petitioner's counsel was allowed to forward a blind letter to Juror no. 8 and allowed to speak with Juror no. 8 by telephone. These efforts were unable to uncover specific facts regarding whether Juror no. 8 felt coerced. Accordingly, it appears that the discovery of Juror no. 8's address and telephone number will do little to further Petitioner's claims of juror coercion. Moreover, there is a strong policy of protecting the privacy of jurors and preventing the disclosure of the addresses and telephone numbers of jurors. *Townsel v. Superior Court*, 20 Cal. 4th 1084, 1092 (1999). Based on the foregoing reasons, the Court finds that Petitioner has failed to show good cause to conduct discovery. Accordingly, Petitioner's motion for leave to conduct discovery is **DENIED**.[5]

---

[5]Moreover, there is no good cause for allowing the discovery of Juror no. 8's contact information in light of both Supreme Court and Ninth Circuit precedent which limits juror testimony only on the question of whether the juror was subject to prejudicial external influences such as bribery or intimidation. *See United States v. Olano*, 507 U.S. 725 (1993); *Dickson v. Sullivan*, 849 F.2d 403, 405-408 (9th Cir. 1988). Thus, even if the Court granted this motion for leave to conduct

**E.      Petitioner's Request For An Evidentiary Hearing**

A federal evidentiary hearing is mandatory only if "(1) petitioner's allegations, if proven, would establish the right to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997). However, if a factual claim can be resolved on the existing record, a federal evidentiary hearing is unnecessary. *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999). Petitioner argues that possible testimony by Juror no. 8 that he voted to find Petitioner guilty because he felt coerced by the court would be highly probative of Petitioner's juror coercion claim. Petitioner argues that he did not have an opportunity for a full and fair evidentiary hearing in front of the Court of Appeal because the trial court would not release the address of Juror no. 8. Petitioner admits that his counsel was allowed to forward a blind letter to Juror no. 8 and allowed to speak with Juror no. 8 by telephone, but contends that these remedies were insufficient to enable development of a factual record of juror coercion. Petitioner relies on *Weaver v. Thompson*, 197 F.3d 359, 362 (1999), where the district court held a full evidentiary hearing in which all 12 jurors were examined on the issue of juror coercion. Based on these findings, the *Weaver* court found that the jury had been coerced into reaching a verdict.

Petitioner's claim of juror coercion can be resolved on the factual record, obviating a need for an evidentiary hearing. After a review of the record, the Court of Appeal set forth a thorough factual background of the exchanges that took place between the trial court and the jury. (Court of Appeal Opinion, pg. 11-14.) The material facts as to jury coercion are fully developed on the record. Because Petitioner's claim of jury coercion can be resolved without the need for an evidentiary hearing, his motion is **DENIED**.

\\\
\\\
\\\
\\\
\\\

---

discovery, Juror no. 8's testimony would not be admissible as part of the record.

19

\\\
\\\
\\\
\\\

## CONCLUSION

For the foregoing reasons, Petitioner's writ of habeas corpus is **DENIED**, Petitioner's Motion For Leave To Conduct Discovery is **DENIED**, and Petitioner's Request for Evidentiary Hearing is **DENIED**.

**IT IS SO ORDERED.**

Dated: July 31, 2006

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE